**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LANCE DANTE KING | ) | |
| | ) | |
| Plaintiff, | ) | No.:  22 C 04605 |
| | ) | |
| vs. | ) | Judge: Virginia M. Kendall |
| | ) | |
| CITY OF CHICAGO, CD OCONNOR, | ) | |
| AR GOMEZ, IG TOLEDO, FJ GOETZ, | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

1.      This is an action for money damages brought pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction for Plaintiff's federal claims is based on 28 U.S.C. §§ 1331 and 1343(a). Jurisdiction for Plaintiff's state claims is based on supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), in that the claims arose in this district as alleged below.

**Parties**

4.      Plaintiff Lance King is a Black man and a resident of Chicago, Illinois.

5.      Defendant Chicago Police Officers CD O'Connor (Star # 8546) and AR Gomez (Star # 13917), IG Toledo (Star # 12037), FJ Goetz (Star # 8398) ("Defendant-Officers") are all duly appointed and sworn Chicago police officers.

6.      At all times relevant to this Complaint, the Defendant-Officers were acting in the course and scope of their employment, and under color of state law, ordinance and/or regulation.

7.      The Defendant-Officers are sued in their individual capacities.

8.      Defendant City of Chicago is a municipal corporation, duly incorporated under

1

the laws of the State of Illinois and is the employer and principal of the Defendant-Officers.

## Facts

1.      On August 29, 2020, Plaintiff was lawfully parked in his vehicle in the area of 4048 W Washington Blvd. in Chicago, Illinois.

2.      Plaintiff, who at the time was in possession of a valid Firearm Owner Identification ("FOID") card and Concealed Carry License ("CCL"), had three lawfully owned firearms in his vehicle with plans to visit the gun range the next day.

3.      On August 29, 2020, at or around 1:40 am, Defendant-Officers O'Connor and Gomez were on patrol. Upon seeing the Plaintiff parked in his vehicle they made a U-turn and pulled in front of his vehicle.

4.      At some time later, Defendant-Officers Toledo and Goetz arrived on scene to assist.

5.      Defendant-Officers approached the Plaintiff's vehicle, positioned themselves on either side of him, and began questioning him about what he was doing.

6.      At that time, Plaintiff was seized and not free to leave.

7.      Prior to seizing the Plaintiff, Defendant-Officers had not seen Plaintiff engage in any illegal activity nor did they have probable cause, reasonable suspicion, or any other lawful basis to stop, question, or detain the Plaintiff.

8.      In their police reports, Defendant-Officers O'Connor and Gomez falsely claimed they "curbed the vehicle" for a "traffic offense" because Plaintiff's headlights were off while his car was parked in violation of a Chicago municipal ordinance.

9.      However, the applicable Illinois laws and City ordinances in effect at that time, and today, do not require headlights to be on or off when a car is parked. M.C.C. § 9-76-090(a)

2

("Whenever a vehicle is lawfully parked at nighttime … no lights need be displayed upon such parked vehicle.").

10. Defendant-Officers stopped Plaintiff pursuant to a *de facto* policy and practice within the Chicago Police Department of disproportionately targeting Black drivers in baseless, pretextual stops as a means to search them and their vehicles, in the hopes of finding contraband or other basis to arrest and criminally charge the Black drivers or occupants of the vehicle.

11. While questioning the Plaintiff during the course of the stop, Defendant-Officers leaned their heads into the car through the windows and used their flashlights to look inside the car. In doing so, they observed multiple firearms under the driver's seat.

12. Plaintiff immediately informed Defendant-Officers that the firearms belonged to him, that they are lawfully owned, and that he was in possession of a valid FOID card and CCL.

13. Without a legal basis, Defendant-Officers ordered Plaintiff out of the car, placed him in handcuffs, and put him in the back of the squad car.

14. Defendant-Officers ran the Plaintiff's licenses and learned that all the firearms found in Plaintiff's vehicle were cleared, that Plaintiff had no warrants, and that Plaintiff was in possession of a valid FOID card and CCL.

15. Despite this, and without legal justification, Defendant-Officers transported Plaintiff to the police station where they kept him for approximately 4 hours.

16. Defendant-Officers then initiated false charges against Plaintiff for three violations of the Conceal Carry Act under 430 ILCS 66.0/70-E, despite having no legal

justification or probable cause to stop, detain, arrest, and/or charge Plaintiff under Illinois law or City ordinances for these or any other criminal offenses.

17.     Defendant-Officers signed criminal complaints against the Plaintiff to initiate these false criminal charges, knowing that there was no legal basis to do so.

18.     Defendant-Officers charged Plaintiff pursuant to a *de facto* policy and practice within the Chicago Police Department of criminalizing legal gun possession by bringing baseless or exaggerated gun charges against lawful Black gun owners in a manner disproportionate to white gun owners.

19.     Plaintiff's criminal case was docketed as *People v. Dante King*, No. 20119328001 in the Circuit Court of Cook County.

20.     Because of the false charges brought by Defendant-Officers, Plaintiff spent multiple nights in custody at the county jail.

21.     Plaintiff was forced to hire a criminal defense attorney and appear at court appearances for a year and a half.

22.     Plaintiff was put under investigation at his place of employment, the Cook County Sheriff's Office, due to these false charges and subsequently lost his job in January of 2021.

23.     Finally, on January 13, 2022, his case was dismissed on the day it was set for trial, even though the Defendant-Officers were present in court, when it became clear that the charges brought by the Defendant-Officers were legally baseless.

24.     Despite this, Plaintiff's lawfully owned guns were destroyed and not returned to him.

25. Throughout the duration of the criminal proceedings brought against Plaintiff, Defendant-Officers took steps to continue the criminal prosecution, including, but not limited to: drafting false police reports, signing baseless criminal complaints, giving false information to the State's Attorney's Office, appearing in court, and failing to bring the truth to light, i,e., that Plaintiff had not committed any crime.

26. During the entire criminal prosecution, Plaintiff was detained as a result of the false gun charges brought by Defendants. At times he was detained in the county jail; at other times he was detained by being on bond, restricted from leaving the State of Illinois and required to attend court on a monthly basis.

27. In order to substantiate the charges against Plaintiff, Defendant-Officers made false and misleading statements in their police reports, including but not limited to: that Plaintiff was pulled over, that he committed a traffic violation, that he claimed he was not aware of the presence of the guns, and that he was in violation of the Concealed Carry Act. None of those things were true.

28. In fact, the Defendant-Officers had no basis to stop, search, or arrest Plaintiff. Instead, they targeted him for a baseless stop and search because he is a Black man who was parked on the Southwest side of Chicago, and proceeded to falsely charged him in order to cover up their own misconduct (the baseless stop) and because they knew they would be able to do so with impunity based on the Chicago Police Department's and the City of Chicago's pattern and practices mentioned above as well as their widespread failure to discipline officers who commit misconduct.

29. The Chicago Police Department and the City of Chicago have a long history of targeting Black men, particularly those found in the South or West sides of Chicago, for

unwarranted stops, searches, arrests, and charges. The Chicago police have a pattern and practice of disproportionately targeting Black drivers in pretextual stops as a means to search their vehicles. Furthermore, they have a pattern and practice of criminalizing gun possession against lawful Black gun owners arising out of pretextual stops. This has been well-documented.

30.     According to the January 13, 2017, Department of Justice report, for example, Black Chicagoans have been disproportionately targeted for decades by the Chicago police department, and have been subjected to disproportionately higher rates of stops, searches, arrests, charges, and uses of force.

31.     This decades-long history of racist policing includes false and exaggerated gun charges brought disproportionately against Black individuals.

32.     According to a December 2020, Research Report from Loyola University's Center for Criminal Justice Research, Policy, and Practice, between 2014 and 2019 individuals arrested for gun crimes in Cook County (where Chicago is the largest City and the Chicago police perform the vast majority of arrests) were more likely to be Black, male, and under 25 years old than people arrested in Illinois outside of Cook County. Specifically, of those arrested for illegal possession of a firearm in Cook County, 79% were Black, 95% were male, and 52% were under the age of 25 years old; while those arrested for illegal firearm possession in Illinois outside of Cook County, 54% were Black, 92% were male, and 44% were under the age of 25 years old.[1]

---

[1] *See Arrests in Cook County for Illegal Possession of a Firearm: Examining the Characteristics and Trends in Arrests for Illegal Possession of a Firearm within the Context of Crimes Involving Guns,* Center for Criminal Justice Research, Policy and Practice, Loyola University Chicago, at p. 6, (December 2020)., *available at,* https://www.luc.edu/media/lucedu/ccj/pdfs/CookCountygunpossessionbulletindecember2020.pdf

33.     This pattern and practice of racist policing has continued into the present day, as demonstrated, in part, by the Chicago Police Department's failure to comply with a consent decree designed to monitor improvements to racist policing.

34.     According to the 2022 Consent Decree Independent Monitoring Report 6, for example, the City of Chicago and the Chicago Police Department did not meet the first stage preliminary compliance with the impartial policing sections under the Agreement and remain not in compliance with ¶¶53-55 which ensure that its policies and practices prohibit discrimination; CPD members interact with all members of the public in an unbiased manner; and prohibit officers from using race in making routine or spontaneous law enforcement decisions.[2]

35.     Additionally, that "[o]verall, the City and the CPD made minimal progress in many areas of Impartial Policing during this reporting period."[3]

36.     Feedback from the Community Focus Report with Black and Latino men between ages 15 and 35 found that "many participants reported having repeated, frequent involuntary contact with police, and some participants indicated having up to 30 involuntary interactions with police in the past year. Many participants described incidents that involved a similar pattern: a traffic stop of a young adult man in a vehicle for a minor non-moving violation—such as a hanging air freshener or the degree of a window tint—followed by a perceived improper search of the vehicle."[4]

---

[2] Chicago Police Department Consent Decree, Independent Monitoring Report 6, January 1, 2022- June 30, 2022, Appendix 4, p. 6-14, *available at,* https://cpdmonitoringteam.com/wp-content/uploads/2022/12/2022.12.15-Independent-Monitoring-Report-6.pdf
[3] Chicago Police Department Consent Decree, Independent Monitoring Report 6, January 1, 2022- June 30, 2022, p. 48, *available at,* https://cpdmonitoringteam.com/wp-content/uploads/2022/12/2022.12.15-Independent-Monitoring-Report-6.pdf
[4] *Id.*, at 30.

37.     Additionally, according to a March 1, 2022, OIG Report on *Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force*, for example, "quantitative evidence from investigatory stop and traffic stop data shows an *overwhelming disparity* in the rates at which Black and non-Black people were stopped by the police. The overrepresentation of Black people among those stopped by the police was consistent across traffic stops and investigatory stops, *and it was persistent across every CPD District*, notwithstanding differences in District crime rates and the demographic composition of District populations."[5]

38.     According to the data collected on investigatory stops, "Black people were subjected to a search of their person 1.5 times more frequently than non-Black people, and also subjected to a pat-down 1.5 times more frequently than non-Black people."[6]

39.     According to the data collected on traffic stops, "Black people were also subjected to a vehicle search more often than non-Black people. Black motorists' vehicles were searched in 0.95% of traffic stops, which made searches of Black motorists' vehicles 3.3 times more frequent than searches of White motorists' vehicles (0.29% of traffic stops of White motorists) and 1.6 times more frequent than searches of all non-Black motorists' vehicles (0.60% of traffic stops of all non-Black motorists)."[7]

40.     According to an August 3, 2022, report from Injustice Watch, the Chicago Police Department reported finding weapons in only 388 traffic stops in 2021, according to data reported to the State of Illinois as part of the Illinois Traffic Stop Study. However, an

---

[5] *Ethnicity-Based Disparities in Chicago Police Department's Use of Force*, City of Chicago Office of Inspector General, (March 1, 2022), p. 31-32, *available at, https://igchicago.org/wp-content/uploads/2022/02/Use-of-Force-Disparities-Report.pdf*
[6] *Id.*
[7] *Id.*

analysis by Injustice Watch found that of the 2021 firearm arrests, "more than 2,300 people were arrested on gun charges and also cited for a minor traffic violation during the same encounter, indicating that the arrest likely started with a traffic stop." Additionally, Injustice Watch reported that "Black drivers were pulled over at five times the rate of white drivers in 2021, according to the traffic stop study data."[8]

41.     The preceding paragraphs support Plaintiff's contention that "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *McTigue v. City of Chicago,* 60 F.3d, 381, 382 (7th Cir. 1995).

42.     The City of Chicago and the Chicago Police Department are well-aware of this historical and present-day widespread practice, and are not only deliberately indifferent to it, but condone it.

43.     According to the *City of Chicago's Report on Chicago Police Department 2020 Litigation,* for example, 19 cases brought against the City of Chicago in 2020 included *Monell* claims that were later settled for between $8,000 and $2,250,000.[9]

44.     Under the "Findings and Status of Any Administrative Investigations" of all the "Settled Cases" that included a *Monell* claim: only 2 out of the 19 Settled Cases were "Sustained" and 2 were "Sustained Pending Appeal." Importantly "disciplinary action" did

---

[8] *See Chicago police are arresting thousands more Black drivers after traffic stops than they report to state regulators*, *available at* https://www.injusticewatch.org/news/police-and-prosecutors/2022/traffic-stop-gun-arrests-chicago-police/; *See also*, *Margaret Armalas and Megan Tomlinson: Chicago's racist pattern of gun arrests creates fresh harm,* Chicago Tribune, July 13, 2022 ("Many of our clients who are arrested after a traffic stop have a FOID with no criminal record and own a gun for self-protection because they live in a community that suffers from a high rate of violent crime.") available at, https://www.chicagotribune.com/opinion/commentary/ct-opinion-chicago-gun-arrests-felonies-racism-20220713-qwewyotxhvhhjdxonxioegiezy-story.html

[9] See *City of Chicago's Report on Chicago Police Department 2020 Litigation,* City of Chicago Department of Law (December 2021), Appendix A, *available at*, https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/City's%20Report%20on%202020%20Litigation%20(With%20Appendices).pdf

not include termination of employment despite the millions of dollars paid out by the City

of Chicago to settle the case.[10]

45.     In September of 2022, the Office of Inspector General ("OIG"), issued a

report after completing an inquiry pursuant to Municipal Code of Chicago (MCC) § 2-56-

230(e), which empowers the OIG Public Safety Section to "review, audit and analyze civil

judgments and settlements of claims against members of the Police Department, and to

issue recommendations based on its findings to inform and improve or correct deficiencies

in the conduct, or operation of the Police Department."[11]

46.     According to the 2022 Report, *Use of Litigation Data in Risk Management*

*Strategies for CPD*, the City of Chicago spent over $250 million on judgments and

settlements between 2017 and 2020.[12] Based on OIG's analysis, it "identified shortcomings

related to the collection and management of litigation data involving CPD. These

shortcomings limit the City's ability to understand areas of litigation risk to the City and to

implement responsive improvements to CPD's operations and policies."[13]

47.     In an interview regarding the 2022 Report, Inspector General Deborah

Witzburg acknowledged that the city was failing to improve CPD policy and practices

stating, "[w]e are paying out a lot of dollars without giving ourselves the opportunity to

---

[10] In one lawsuit determined to be "Sustained" by Administrative Investigations resulted in a $2,250,000 settlement paid by the City of Chicago. Termination of the officer's employment was never a "disciplinary action" recommended by any investigating administrative agencies. Rather, a 90-day suspension was originally recommended, and only later after criticism and outcry, a 180-day suspension was ultimately recommended. *See Facing 6 Month Suspension For Shooting An Unarmed Teenager With Developmental Disabilities*, CBS Chicago, (March 11, 2019), *available at*, https://www.cbsnews.com/chicago/news/police-officer-shoots-teen-developmental-disabilities-suspension/
[11] *Use of Litigation Data in Risk Management Strategies for CPD*, City of Chicago Office of Inspector General, (September 29, 2022), *available at* https://igchicago.org/wp-content/uploads/2022/09/Use-of-Litigation-Data-in-Risk-Management-Strategies-for-the-Chicago-Police-Department.pdf
[12] *Id.*
[13] *Id.*

learn any lessons as a result. The city is not collecting the sort of information which would allow practices and policies to be improved[.] We should be learning lessons from settlements and judgments being paid out. Those are taxpayer dollars being paid out, either because there has been a finding that something went wrong or the city has made a determination to settle a claim that something went wrong. We are missing very expensive opportunities if we are not informing ourselves and improving practices and policies as a result of those settlements and judgments."[14]

48.    The preceding paragraphs illustrate a widespread practice that has been acknowledged by City of Chicago Agencies as recently as 2022 and continues to be perpetuated and cemented by the City of Chicago, the Chicago Police Department, and individual Chicago Police officers though lack of disciplinary repercussions, lack of accountability, and failure to improve and implement best practice policies. The City's failure to adequately address the Chicago Police Department's racist and inequitable policies and practices is evidenced by the hundreds of millions of dollars spent on settling lawsuits, lack of accountability, and no responsive policy reforms.

49.    The lack of investigations, accountability, disciplinary actions, and/or resulting policy improvements, despite paying hundreds of millions of dollars to settle lawsuits against the City of Chicago and Chicago police, evidences the City's deliberate indifference to the violation of the rights of Black Chicagoans like Plaintiff.

50.    Defendant-Officers conducted a racially motivated, baseless, pretextual stop of the Plaintiff in order to search his vehicle. Then, even though he was found to be in

---

[14] See *Taxpayers shell out $250M in police-related settlements; new report slams city efforts to learn from those mistakes*, Chicago Sun Times, (Sept 29, 2022), *available at*, https://chicago.suntimes.com/city-hall/2022/9/29/23379031/chicago-police-misconduct-lawsuits-settlements-inspector-general-witzburg-risk-management-lightfoot

possession of guns *that he was legally licensed and fully entitled to possess*, they arrested him anyway and charged him with crimes he had not committed. This was done as a result of their own improper racial motivations but also pursuant to the City of Chicago and Chicago Police Department's *de facto* policy and practice of disproportionately targeting Black drivers in pretextual stops as a means to search their vehicles and criminalizing gun possession by Black gun owners arising out of the pretextual stops.

51.     As a direct and proximate result of the acts of the Defendant-Officers as well as the unconstitutional pattern and practice of the City of Chicago, described above, Plaintiff was seized, arrested, detained, and prosecuted for crimes he did not commit and suffered damages including but not limited to: loss of freedom, emotional distress, loss of his personal property, attorney's fees, and the loss of his job and income.

52.     Each individual Defendant-Officer personally participated in the unlawful conduct, and/or acted jointly and in concert with the other Defendants who participated or acquiesced in the unlawful conduct or failed to intervene to stop the unlawful conduct or bring the truth to light.

## COUNT I
### 42 U.S.C. §1983 – Unreasonable Seizure / False Arrest Claim v. Defendant-Officers

53.     Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

54.     Defendant-Officers stopped, seized, and arrested Plaintiff and/or failed to intervene to stop the false arrest of Plaintiff despite having the opportunity to do so.

55.     Defendant-Officers did not have probable cause or any other legal justification to stop, seize, or arrest Plaintiff.

56.     The stop, seizure, and arrest of Plaintiff without probable cause violated his Fourth Amendment right, as guaranteed by the Fourteenth Amendment, to be free from

unreasonable seizures.

WHEREFORE, Plaintiff asks that this Honorable Court:

a)  Enter judgment against Defendant-Officers,

b)  Award Plaintiff compensatory and punitive damages,

c)  Award attorneys' fees and costs, and

d)  Award any further relief that this Honorable Court deems just and equitable.

## COUNT II
### 42 U.S.C. §1983 – Fourth Amendment Unlawful Detention/Federal Malicious Prosecution Claim v. Defendant-Officers

57.     Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

58.     Defendant-Officers, knowing that probable cause did not exist, acted individually, and/ or jointly, to cause Plaintiff to be arrested, detained and charged for violation of the Concealed Carry Act knowing that Plaintiff was being seized and detained without probable cause for those charges, thereby violating Plaintiff's right to be free from unreasonable seizures guaranteed to him by the Fourth and Fourteenth Amendments of the United States Constitution.

59.     During his criminal prosecution, Plaintiff was detained for two days in a correctional facility with significant restrictions of liberty and movement. Even when on bond, Plaintiff's freedom of movement was restricted, he had conditions of bond that he was required to comply with or face arrest, including his appearance being compelled at court dates, and he was under the jurisdiction and control of the Cook County court system.

WHEREFORE, Plaintiff asks that this Honorable Court:

a)  Enter judgment against Defendant-Officers,

b)  Award Plaintiff compensatory and punitive damages,

c)  Award attorneys' fees and costs, and

d)  Award any further relief that this Honorable Court deems just and equitable.

### COUNT III
**42 U.S.C. § 1983 — Equal Protection Claim (Race-Based Discrimination) v. Defendant-Officers**

60.     Plaintiffs re-allege all preceding paragraphs as if fully set forth herein.

61.     Defendant-Officers targeted Plaintiff not because they had any lawful or legitimate basis to do stop and arrest him, but because he was a Black man on the Southwest side of Chicago.

62.     "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976).

63.     Government actions such as those taken against the Plaintiff, that target members of a "suspect class" (e.g. people of a certain race), are done in violation of the Equal Protection Clause of the Fourteenth Amendment.

WHEREFORE, Plaintiff asks that this Honorable Court:

a)  Enter judgment against Defendant-Officers,

b)  Award Plaintiff compensatory and punitive damages,

c)  Award attorneys' fees and costs, and

d)  Award any further relief that this Honorable Court deems just and equitable.

### COUNT IV
**42 U.S.C. § 1983 Policy and Practice *Monell* Claim v. the City of Chicago**

64.     Plaintiffs re-allege all preceding paragraphs as if fully set forth herein.

65.     This Count is alleged against the City of Chicago.

66.     Defendant-Officers acted under the color of law and pursuant to one or more

interrelated *de facto* policies, practices, and/or customs of the CPD and City of Chicago to violate Plaintiff's Fourth and Fourteenth Amendment rights as set forth above, and the City of Chicago was aware of and deliberately indifferent to those constitutionally infirm policies, making the City of Chicago liable.

WHEREFORE, Plaintiff demands actual or compensatory damages plus the costs of the action and attorneys' fees, and whatever additional relief the Court deems equitable and just.

## COUNT V
### State Law Malicious Prosecution Claim v. Defendant-Officers

67.     Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

68.     Some or all of the Defendant-Officers commenced and/or continued false felony criminal charges against Plaintiff.

69.     Defendant-Officers did so with malice.

70.     There was no probable cause for such charges.

71.     The charges were terminated in a manner favorable and indicative of the innocence of the Plaintiff.

WHEREFORE, Plaintiff asks that this Honorable Court:

a)  Enter judgment against Defendant-Officers

b)  Award Plaintiff compensatory and punitive damages,

c)  Award costs, and

d)  Award any further relief that this Honorable Court deems just and equitable.

## COUNT VI
### Indemnification Claim pursuant to 745 ILCS 10/9-102 v. City of Chicago

72.     The acts of the Defendant-Officers described above were committed in the scope of employment.

73.     Pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/9-102, Defendant City of Chicago is liable for any judgments in this case arising from the Defendant-Officers' actions.

WHEREFORE, Plaintiff asks that this Honorable Court order Defendant City of Chicago to indemnify the Defendant-Officers for any judgment, settlement, attorney's fees and costs entered in this case arising from their actions.

## COUNT VII
### State Law *Respondeat Superior* Claim v. City of Chicago

74.     The acts of the Defendant-Officers, as described above, were committed in the scope of employment.

75.     As principal and employer, Defendant City of Chicago is liable for its agents' actions under the doctrine of *respondeat superior.*

WHEREFORE, Plaintiff asks that this Honorable Court find Defendant City of Chicago liable for the actions of Defendant-Officers for any judgment entered in this case arising from their actions in the state law claims.

76.     Plaintiff demands a trial by jury on all claims.


Respectfully submitted,

/s/ Sara Garber
*Counsel for Plaintiff*


Sara Garber
Thedford Garber Law
1932 S Halsted, Suite 506
Chicago, Illinois 60608
773-288-9304
sara@thedfordgarberlaw.com
ARDC: 6303358

16

Tony Thedford
Thedford Garber Law
1932 S Halsted, Suite 506
Chicago, Illinois 60608
773-315-1033
tony@thedfordgarberlaw.com
ARDC: 6239316