**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LANCE DANTE KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 22 C 4605 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Four Chicago Police Officers—O'Connor, Gomez, Toledo, and Goetz ("the officers")—approached Lance King, a Black man, in his car for allegedly violating a local ordinance that requires parked cars to display their headlights. In the car, King had three guns, which he intended to use at a shooting range the next day. Even though King lawfully possessed the weapons, the officers arrested King, who was later detained for several days and prosecuted. On the morning of trial, the state dropped the charges. King sued the officers for false arrest, unlawful detention, malicious prosecution, and equal-protection violations; and the City of Chicago for maintaining unconstitutional practices, indemnification of their officers, and *respondeat superior* liability. The officers move to the dismiss the equal-protection claim, (Dkt. 31); Chicago moves to dismiss all counts against it, (Dkt. 34). For the following reasons, the officers' motion is denied, (Dkt. 31); Chicago's motion is denied in part and granted in part, (Dkt. 34).

## BACKGROUND

On August 29, 2020, Chicago Police Officers Gomez and Toledo approached King, a Black man, while he was lawfully parked in his vehicle. (Dkt. 28 at ¶ 3).[1] At the time, King—who possessed a valid Firearm Owner Identification ("FOID") card and a Concealed Carry License ("CCL")—had three firearms in his car because he planned to go shooting at a gun range the next day. (*Id.* ¶ 2). O'Connor and Gomez, later joined by Police Officers Toledo and Goetz, positioned themselves on both sides of King's car and began questioning him. (*Id.* ¶ 5). The officers claimed that they "curbed the vehicle" because King's headlights were off while his car was parked, supposedly in violation of a municipal ordinance. (*Id.* ¶ 8). King alleges, however, that no law requires a parked vehicle to display its headlights and, moreover, that the officers singled him out "pursuant to a *de facto* policy … of disproportionately targeting Black drivers in baseless, pretextual stops as a means to search them and their vehicles." (*Id.* ¶ 10).

During the questioning, the officers leaned into the car and discovered the firearms under the driver's seat. (*Id.* ¶ 11). King said that the weapons were his, that he lawfully owned them, and that he possessed a valid FOID card and CCL. (*Id.* ¶ 12). Unpersuaded, the officers ordered King out of the car and moved him to the back of a squad car in handcuffs. (*Id.* ¶ 13). They then confirmed the licenses were valid and verified that King had no warrants. (*Id.* ¶ 14). Nonetheless, the officers transported King to the police station, where he was held for four hours and charged with violations of the Conceal Carry Act, 430 ILCS 66/70-E. (*Id.* ¶¶ 15–16). King maintains the officers charged him "pursuant to a *de facto* policy and practice within the Chicago Police Department of criminalizing legal gun possession by bringing baseless or exaggerated gun charges against lawful Black gun owners in a manner disproportionate to white gun owners." (*Id.* ¶ 18).

---

[1] King does not number the paragraphs in his complaint continuously; the reference numbers here are taken from the "facts" section, which begins on page two.

Because of his arrest, King spent several nights in jail, had to hire a defense lawyer, and was fired from his job with the Cook County Sheriff's Office. (*Id.* ¶¶ 20, 22). Ultimately, the criminal case was dismissed on the day it was set for trial. (*Id.* ¶ 23). King then sued the officers for unreasonable seizure and false arrest (Count I), unlawful detention and malicious prosecution (Count II), a violation of the Equal Protection Clause (Count III), and state-law malicious prosecution (Count V); and the City of Chicago for establishing a policy and practice that caused its agents to violate his Fourth and Fourteenth Amendment rights, *see Monell v. Department of Social Services*, 436 U.S. 658 (1978), (Count IV), indemnification for its officers under the Illinois Tort Immunity Act (Count VI), and *respondeat superior* liability (Count VII). (*Id.* ¶¶ 53–76). The officers move to dismiss King's equal-protection claim (Count III) for failure to state a claim. (Dkt. 31).[2] Chicago moves to dismiss all three counts against it for failure to state a claim (Counts IV, VI, VII). (Dkt. 34).

## **LEGAL STANDARD**

Under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20

---

[2] The officers argued that their motion should be granted because King neglected to submit a timely response brief. (Dkt. 37). But this Court granted King an extension due to the confusion caused from the two different briefing schedules. (Dkt. 40).

F.4th 303, 307 (7th Cir. 2021) (cleaned up). "[A]llegations in the form of legal conclusions are," however, "insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014)).

## DISCUSSION

### I.     Equal Protection (Count III)

"No State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Equal Protection Clause ensures that "persons similarly situated should be treated alike" through review of government classifications based on specific characteristics. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 339 (1985); *see also* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 9.1.2 (5th ed. 2015) ("[A]ll equal protection issues can be broken down into three questions: What is the classification? What level of scrutiny should be applied? Does the particular government action meet the level of scrutiny?"). This review comes in three forms: strict scrutiny, intermediate scrutiny, or rational-basis review. *Hope v. Commissioner of Ind. Dep't of Correction*, 9 F.4th 513, 528–29 (7th Cir. 2021) (en banc). Racial or national-origin classifications trigger strict scrutiny. *Graham v. Richardson*, 403 U.S. 365, 371 (1971) (alienage); *Loving v. Virginia*, 388 U.S. 1, 11–12 (1967) (race). *But see Mathews v. Diaz*, 426 U.S. 67, 86–87 (1976) (limiting strict scrutiny to state alienage classifications). Gender or legitimacy classifications require intermediate scrutiny. *United States v. Virginia*, 518 U.S. 515 (1996) (gender); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (legitimacy). All other classifications are reviewed for a rational basis. *United States v. Vaello-Madero*, 142 S. Ct. 1539, 1543 (2022); *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

The parties disagree about the type of equal-protection claim King advances. The officers argue that King "failed to plead a 'class of one' Equal Protection Claim" because he did not plead "facts to make a *prima facie* showing of discriminatory profiling based on race." (Dkt. 31 at 3). This statement confuses the law. A "class of one" claim is premised on the idea that a "plaintiff has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The purpose "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Id.* (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)) (cleaned up). There should, however, be no confusion: a class-of-one claim does not involve a classification based on a protected trait—such as race or gender—and, thus, is only reviewed for a rational basis, a forgiving standard. The government satisfies its constitutional obligations "so long as there is a plausible policy reason for the classification … and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 107 (2003) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11–12 (1992)). Nothing suggests this case involves such a claim.[3] A brief review of the complaint makes it emphatically clear that King believes the four officers treated him differently because of race. A race-discrimination claim differs *in kind* from a class-of-one claim.

"[A]ll racial classifications imposed by government must be analyzed by a reviewing court under strict scrutiny." *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)); *see also Richmond v. J.A. Croson Co.*, 488

---

[3] Despite King unambiguously declaring in the opening paragraph of his response brief that "[p]laintiff does not make a 'class of one' Equal Protection claim," (Dkt. 41 at 1), the officers doubled down on their misunderstanding, dedicating two pages of their reply to the issue, (Dkt. 43 at 9–10).

U.S. 469, 493 (1989) (plurality opinion) ("Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining … what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics."). A plaintiff can prove a state has imposed a racial classification by identifying either (1) a law that draws facial classifications based on race or (2) a law that, while facially neutral, was either racially motivated or racially administered. *See, e.g.*, *Johnson*, 543 U.S. at 506–07 (an official policy of racial segregation in prisons); *Hunter v. Underwood*, 471 U.S. 222, 223–24 (1985) (facially neutral provision of a state constitution enacted to disenfranchise Black voters); *see also* Chemerinsky, *Constitutional Law* § 9.3.2. The second type of classification—which King asserts—requires that the state action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also Palmer v. Thompson*, 403 U.S. 217, 224–25 (1971). A discriminatory effect occurs when "a member of a protected class … was treated differently from a similarly situated member of an unprotected class." *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017). A discriminatory purpose "implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (cleaned up).

Here, King stated a plausible claim of race discrimination. He alleges that the officers stopped him pretextually because he was Black. (Dkt. 28 ¶ 10). Numerous studies indicate that King received different treatment from non-Black drivers. For example, the Office of Inspector General Report on *Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force* "shows an *overwhelming disparity* in the rates at which Black and non-Black people were

stopped by the police." (*Id.* ¶ 37). The discriminatory purpose and effect together suggest that the officers made an unjustified racial classification, one which cannot survive strict scrutiny.

The officers' principal objection relates to King's use of statistical evidence. They maintain that the several studies cited do not "identify any action(s) by the *Defendant Officers* in how they interact with the community, or [] indicate specific instances for comparison of similarly situated 'white individuals.'" (Dkt. 31 at 9). This argument rests on a faulty legal proposition. Unlike the general requirements for establishing a discriminatory purpose, statistics—and statistics alone— are "repeatedly relied on" to "prove discriminatory effect." *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001); *see also Hunter*, 471 U.S. at 227; *Schweiker v. Wilson*, 450 U.S. 221, 233 (1981); *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886). The Seventh Circuit's opinion in *Chavez v. Illinois State Police* emphasizes that a plaintiff unable to name a similarly situated individual can nonetheless use reliable statistics to show a discriminatory effect. 251 F.3d at 637– 38.[4] In urging a contrary result, the officers appear to conflate discriminatory purpose and effect. It is true that to establish a discriminatory purpose, a plaintiff must demonstrate that the decisionmaker was motivated by race. *McCleskey*, 481 U.S. at 298. There, statistical disparities by themselves rarely serve as dispositive proof of equal-protection violations; more often, they are used together with other evidence to support an inference of an impermissible racial motive. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 548–49 (1999); *Chavez*, 251 F.3d at 647; *cf. Washington v.*

---

[4] *See also Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) ("A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated or through the use of statistical or other evidence which 'address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'"); *Bradley v. United States*, 299 F.3d 197, 206 n.11 (3d Cir. 2002) ("In profiling cases, where it is often difficult to submit direct evidence that members of an unprotected class were not targeted for a search, statistical evidence of discrimination may be the only means of proving a discriminatory effect."); *United States v. Hare*, 308 F. Supp. 2d 955, 991 (D. Neb. 2004) ("Discriminatory effect may by proved with specific evidence of similarly situated non-minority motorists who were not stopped for the traffic violation, or with statistical or other evidence which generally proves that members of a protected racial group—in this case African Americans—receive less favorable treatment than nonmembers.").

*Davis*, 426 U.S. 229, 242 (1976). As explained above though, proving discriminatory effect has no parallel requirement. *See Conley v. United States*, 5 F.4th 781, 796 (7th Cir. 2021) ("As a general matter, statistics can be 'a useful tool' that can establish discriminatory effect and provide powerful evidence of discriminatory intent if race can be isolated from other confounding variables.").

That is not to say King has an easy case ahead. But at the motion-to-dismiss stage, he only needed to plead facts—which are assumed true—that the officers discriminated against him because he was Black, and non-Black motorists received different treatment. *See Crescent Plaza Hotel Owner*, 20 F.4th at 307. He has done so.

## II.    *Monell* Claim (Count IV)

Section 1983 states,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law …

42 U.S.C. § 1983.

To prevail on a § 1983 claim, a plaintiff must demonstrate that "he was deprived of a right secured by the Constitution or laws of the United States; and [] the deprivation was visited upon him by a person or persons acting under color of state law." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (quoting *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). The Supreme Court held in *Monell v. Department of Social Services* that a municipality is a suable "person" within the meaning of the statute—but only "when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible" for. *Orozco v. Dart*, 64 F.4th 806, 823 (7th Cir. 2023)

8

(quoting *Monell*, 436 U.S. at 694); *see also Bd. of Cnty. Cmm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*."). "[A] municipality is not vicariously liable for the conduct of its employees." *Orozco*, 64 F.4th at 823. The law reflects this balance.

A *Monell* claim requires "evidence of (1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the "moving force" behind the constitutional injury." *Braun v. Village of Palatine*, 56 F.4th 542, 552 (7th Cir. 2022) (quoting *LaPorta*, 988 F.3d at 986) (cleaned up). An "action pursuant to a municipal policy" can be an express policy, a widespread practice, custom, or practice, or a "constitutional injury [that] was caused by a person with final policymaking authority." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (quoting *LaPorta*, 988 F.3d at 986). "Inaction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'" *Id.* (quoting *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc)). Municipal fault—deliberate indifference—sets a high bar for plaintiffs. "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary," *Calderone v. City of Chicago*, 979 F.3d 1156, 1164 (7th Cir. 2020), unless "the unconstitutional consequences" are "so patently obvious that a city could be liable … without proof of pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64 (2011). And a "rigorous causation standard" exists to ensure a direct link between the municipal action and the alleged constitutional violation. *LaPorta*, 988 F.3d at 986.

Although King's complaint lacks some clarity, it sets out a plausible *Monell* claim. There are several alleged underlying constitutional violations. *Id.* King supposedly faced unlawful

seizure, false arrest, malicious prosecution, unlawful detention, and as explained above, a violation of the Equal Protection Clause. (*See generally* Dkt. 28). Chicago does not contest their sufficiency. The more difficult inquiry asks whether these actions can be causally attributed to a Chicago policy. They can.

King identifies a municipal "action" by alleging that Chicago maintains practices of both pretextually stopping Black motorists more than non-Black motorists "in the hopes of finding contraband or other basis to arrest" *and* arresting and disproportionately "bringing baseless or exaggerated gun charges against lawful Black gun owners."[5] (*Id.* ¶¶ 10, 17). Numerous facts, drawn from published studies, buttress these assertions:

- According to the January 13, 2017, Department of Justice report, for example, Black Chicagoans have been disproportionately targeted for decades by the Chicago police department, and have been subjected to disproportionately higher rates of stops, searches, arrests, charges, and uses of force. (*Id.* ¶ 30).

- According to a December 2020, Research Report from Loyola University's Center for Criminal Justice Research, Policy, and Practice, between 2014 and 2019 individuals arrested for gun crimes in Cook County (where Chicago is the largest City and the Chicago police perform the vast majority of arrests) were more likely to be Black, male, and under 25 years old than people arrested in Illinois outside of Cook County. Specifically, of those arrested for illegal possession of a firearm in Cook County, 79% were Black, 95% were male, and 52% were under the age of 25 years old; while those arrested for illegal firearm possession in Illinois outside of Cook County, 54% were Black, 92% were male, and 44% were under the age of 25 years old. (*Id.* ¶ 32).

- According to the 2022 Consent Decree Independent Monitoring Report 6, for example, the City of Chicago and the Chicago Police Department did not meet the first stage preliminary compliance with the impartial policing sections under the Agreement and remain not in compliance with ¶¶ 53-55 which ensure that its policies and practices prohibit discrimination; CPD members interact with all members of the public in an unbiased manner; and prohibit officers from using race in making routine or spontaneous law enforcement decisions. Additionally, that '[o]verall, the City and the CPD made minimal progress in many areas of Impartial Policing during this reporting period. (*Id.* ¶¶ 34–35).

---

[5] King seems to suggest that Chicago failed to train its officers properly to avoid this unconstitutional practice. The Court need not consider that argument—and possible waiver—because King states a municipal action through the second possibility policy, custom, or widespread practice.

- Feedback from the Community Focus Report with Black and Latino men between ages 15 and 35 found that "many participants reported having repeated, frequent involuntary contact with police, and some participants indicated having up to 30 involuntary interactions with police in the past year. Many participants described incidents that involved a similar pattern: a traffic stop of a young adult man in a vehicle for a minor non-moving violation—such as a hanging air freshener or the degree of a window tint—followed by a perceived improper search of the vehicle. (*Id.* ¶ 36).

- [A]ccording to a March 1, 2022, OID Report on *Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force*, for example, 'quantitative evidence from investigatory stop and traffic stop data shows an *overwhelming disparity* in the rates at which Black and non-Black people were stopped by the police. The overrepresentation of Black people among those stopped by the police was consistent across traffic stops and investigatory stops, *and it was persistent across every CPD District*, notwithstanding differences in District crime rates and the demographic composition of District populations.' (*Id.* ¶ 37).

- According to the City of Chicago's Report on Chicago Police Department 2020 Litigation, for example, 19 cases brought against the City of Chicago in 2020 included Monell claims that were later settled for between $8,000 and $2,250,000. (*Id.* ¶ 43).

- According to the 2022 Report, *Use of Litigation Data in Risk Management Strategies for CPD*, the City of Chicago spent over $250 million on judgments and settlements between 2017 and 2020. Based on OIG's analysis, it 'identified shortcomings related to the collection and management of litigation data involving CPD. These shortcomings limit the City's ability to understand areas of litigation risk to the City and to implement responsive improvements to CPD's operations and policies.' (*Id.* ¶ 46).

The combined numerous and detailed sources permit an inference that Chicago maintained a policy that disproportionately targeted motorists based on race.

In response, Chicago attempts to undermine the evidentiary value of each source, relying on *Taylor v. City of Chicago*, No. 21 CV 2197, 2021 WL 4523203 (N.D. Ill. Oct. 23, 2021). But the city makes its argument too early. Recall that City moved to dismiss for failure to state a claim. (Dkt. 37). At this point, facts—which King provides in ample support of his *Monell* claim—are assumed true, and every reasonable inference is drawn in the plaintiff's favor. *Iqbal*, 556 U.S. at

678 ("[A] court must accept as true all of the allegations contained in a complaint …."). Only "sheer speculation, bald assertions, and unsupported conclusory statements" are rejected. *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). Courts should not— and cannot—weigh the relative strength of conflicting evidence or engage in divide-and-conquer tactics. Nor is *Taylor* helpful for the city. There, the plaintiff failed to include any report in his actual complaint, mentioning only one for the first time in his response brief.[6] *Taylor*, 2021 WL 4523203, at *2.

      The same factual allegations establishing a widespread practice also suffice to demonstrate that Chicago was deliberately indifferent to King's constitutional rights. King cannot, as Chicago repeats, point to a facially unlawful policy or a policy so patently unconstitutional that consequences of establishing it would be obvious. *See Polk County*, 960 F.3d at 379–80. King can, however, "point to evidence of 'a prior pattern of similar constitutional violations.'" *Taylor*, 26 F.4th at 435 (quoting *Polk County*, 960 F.3d at 380). The facts bulleted above allege the necessary pattern evidence. *Id.* Consider simply the first two factual allegations. The DOJ report showed that "Black Chicagoans have been disproportionately targeted for decades by the Chicago police department, and have been subjected to disproportionately higher rates of stops, searches, arrests, charges, and uses of force." (Dkt. 28 ¶ 30). That finding may have put the city on notice of constitutional violations in pretextual police stops. The Research Report from Loyola University's Center serves the same function for gun crimes: "individuals arrested for gun crimes in Cook County (where Chicago is the largest City and the Chicago police perform the vast majority of

---

[6] The district court judge noted in passing that the length of time since the publication of one report King includes "diminishes its usefulness as an allegation of the practices in place at the time of Taylor's seizure." *Id.* at *3. Chicago makes great use of this statement. The next line in the paragraph sheds some useful light: "[w]ithout anything in the complaint to suggest that the practices … were still in place," the report lost its force. *Id.* But King does add many more factual allegations, which together with the report support his claim.

12

arrests) were more likely to be Black, male, and under 25 years old than people arrested in Illinois outside of Cook County." (*Id.* ¶ 32). Again, this allegation suggests that Chicago might have known of these violations (among others).

Chicago submits contrary evidence. It claims, "the Chicago City Council has been outspoken advocates for police accountability and reform and with the new mayoral administration's promises of a new era of accountability in the police department. *See generally Bonds v. City of Chi.*, 451 F. Supp. 3d 900, 909 (N.D. Ill. 2020). These promises have been memorialized in a variety of different legislative methods …." (Dkt. 34 at 8). But the city once again raises an evidentiary argument too early. "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1158 (10th Cir. 2021) (quoting *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003)).

Finally, the alleged unlawful practice directly harmed King. *See Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) ("[A] rigorous causation standard [] requires the plaintiff to show a direct causal link between the challenged municipal action and the violation of his constitutional rights." (quoting *LaPorta*, 988 F.3d at 987) (cleaned up)). If Chicago had a widespread policy of detaining and arresting Black motorists for, among other things, gun crimes, then that policy was the "moving force" behind King's harm. He was unlawfully stopped, searched, arrested, detained, and prosecuted for permitted gun ownership because—assuming all facts are true—he was Black. (*See generally* Dkt. 28). As such, King has stated a plausible claim for relief under *Monell*.

### III.    Indemnification and *Respondeat Superior* (Counts VI & VII)

The Court can make short work of the remaining counts. Respondeat superior does not furnish an independent cause of action. *See, e.g.*, *Wilson v. Edward Hosp.*, 981 N.E.2d 971, 980 (Ill. 2012) ("We conclude that actual agency and apparent agency are not causes of action …."); *O'Bryan v. Holy See*, 556 F.3d 361, 370 n.1 (6th Cir. 2009) ("Plaintiffs also plead a separate cause of action titled 'Respondeat Superior Liability.' However, respondeat superior is not a cause of action. It is a basis for holding the [defendant] responsible for the acts of its agents."); *Winn v. City of Chicago*, No. 20 C 5246, 2022 WL 80272, at *7 (N.D. Ill. Jan. 6, 2022) ("[T]he court agrees that respondeat superior is not a basis for an independent claim; it is instead a theory on which the City can be held liable for torts committed by officers."); *Jones v. UPS Ground Freight, Inc.*, No. 15 C 7991, 2016 WL 826403, at *3 (N.D. Ill. March 3, 2016) ("UPS is correct— respondeat superior is not by itself a cause of action."). King pleads *respondeat superior* as a standalone claim, not a theory of liability; it must, then, be dismissed.

In contrast, the Illinois Tort Immunity Act compels a local public entity "to pay any tort judgment or settlement for compensatory damages … for which it or an employee while acting within the scope of his employment is liable." 745 ILCS 10/9-102; *see also Vinson v. Vermilion County*, 776 F.3d 924, 930 (7th Cir. 2015) ("The Fourth Amendment claims against Champaign and Vermilion Counties under the Tort Immunity Act, 745 ILCS 10/9–102, must also be reinstated, as the defendants have conceded that the validity of those claims is dependent on the validity of the Fourth Amendment claims."); *Wilson v. City of Chicago*, 120 F.3d 681, 685 (7th Cir. 1997) ("It does not follow that Wilson could not proceed under section 9–102 until the judgment against Burge became final. The City concedes as it must that if it disobeys the direction in the statute (assuming the statute is applicable to the City), the plaintiff can obtain a judgment against it.");

14

*Cates v. Manning*, No. 19 C 5248, 2020 WL 1863299, at *3 (N.D. Ill. Apr. 14, 2020) ("[Section] 1983 plaintiffs routinely assert section 9-102 indemnification claims against municipalities simultaneously with the underlying claims against the individual officers who may have harmed them.").[7] The claims against the officers remain live, so Chicago is still liable for indemnification if King prevails.

## **CONCLUSION**

For these reasons, the officers' partial motion to dismiss (Count III) is denied. (Dkt. 31). The City of Chicago's motion to dismiss is denied in part (Counts IV & VI) and granted in part (Count VII) with leave to file an amended complaint, if it comports with this opinion, no later than 7/31/23. (Dkt. 34).

Virginia M. Kendall
United States District Judge

Date: July 11, 2023

---

[7] Chicago only refers to 735 ILCS 5/2-202 in its reply brief, (Dkt. 44 at 10), an entirely separate provision than the one King names in his complaint and is relevant to the lawsuit. The very case Chicago cites only one paragraph later, *Winn v. City of Chicago*, 2022 WL 80272, actually held that the city was still liable under 9-102 because claims against individual officers remained.